
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37135-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN A. RADAVICH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — John Radavich appeals his conviction for the aggravated first

degree murder of Robert Tester. He contends (1) the trial court's in limine rulings

excluding evidence were erroneous and violated Mr. Radavich's constitutional right to

present a defense, (2) the evidence was insufficient to prove murder aggravated by

commission of the offense during the course of, or in furtherance of, first degree

burglary, and (3) Mr. Radavich's right to jury unanimity was violated. We find no error

or abuse of discretion and affirm.

No. 37135-2-III
*State v. Radavich*

## FACTS AND PROCEDURAL BACKGROUND

In the early morning hours of September 6, 2016, John Tester's then-eight-year-old daughter K.T.,[1] who was sleeping in her father's room, woke to her father's screams. Looking across the hallway to the bathroom, she saw an unknown man, dressed all in black with his face covered, stabbing her father with a sword and a knife. Her father was not holding a weapon and was saying, "Please stop." Report of Proceedings (RP) at 1102. K.T.'s father's cellphone was on the bed and she tried to use it to call contacts but no one answered.

Mr. Tester managed to leave the bathroom and moved toward the living room. The unknown man followed him. First, though, the unknown man said to K.T., "Stay there. I'm going to kill your dad." RP at 1105.

In what K.T. would describe as "a few minutes later" she left the bedroom and found her father lying down in the living room covered in blood, with what she thought was an ax in his back. RP at 1108. She took the ax off his back to try to help him and talked to him, but when he did not respond she was scared and returned to the bedroom. Although it was hard, she eventually went to sleep. When she was awakened by an

---

[1] This court refers to juvenile witnesses using initials or pseudonyms. *See* General Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), http://www.courts.wa.gov/appellate_trial _courts/.

alarm, she called her grandmother and told her a man broke in and killed her dad. Her grandfather contacted police at around 7:18 a.m.

Spokane County sheriff's deputies were dispatched to Mr. Tester's home. He was determined to be dead upon the first officer's arrival. Sergeant Andrew Stockman, the assigned "scene lead" detective observed in arriving at the Tester home that the garage door was open. No blood was discovered on the front steps or threshold of the front door, and the front door showed no sign of forced entry. Inside, he observed that Mr. Tester's body had come to rest in a "completely defenseless . . . submissive" position. RP at 998. A splitting maul that K.T. mistook for an ax was found in close proximity to Mr. Tester's body, almost completely saturated in blood.

Sergeant Stockman would later describe the interior of the home as having the "most widely distributed area of blood spatter transfer, pooling, bloodletting" that he had seen in his career. RP at 934. For his department to handle the blood analysis would require thousands of photographs, so he decided to enlist the assistance of the Washington State Patrol (WSP) crime scene response team. They had advanced 3D scanning equipment that could capture and correlate images in ways that facilitated and improved analysis.

Detective Lyle Johnston was assigned to lead the investigation of the murder, and he interviewed many relations and associates of Mr. Tester. One of them was Erika

3

Boyle.[2] K.T. characterized Ms. Boyle, whom she knew as Iris, as her father's girlfriend. None of those interviewed was considered a suspect. Then, in December 2016, Detective Johnston received a voicemail from a caller named Ricky Watt who said he had information about Mr. Tester's death. When contacted by the detective, Mr. Watt explained that he had recorded a conversation with a friend, John Radavich, in which Mr. Radavich said he killed Mr. Tester.

In the recorded conversation, which was turned over to the sheriff's department and transcribed, the speaker that Mr. Watt identified as Mr. Radavich said he had met a girl named Skittles, whose real name was Iris, whom he "became very close to, very protective of." Ex. P-3, at 6. He told Mr. Watt that Skittles had gotten into an abusive relationship with a 35-year-old man. Mr. Radavich said the man was using methamphetamine and was "pretty much beating her, raping her." *Id.* Mr. Radavich said he was "finally . . . done 'cause the police wouldn't do jack shit about it. Nobody would do anything . . . ." *Id.* at 7. Reminding Mr. Watt that "we . . . always said we were guardians," Mr. Radavich said he "took care of it" and "kind of removed him from the equation." *Id.* When Mr. Watt pressed Mr. Radavich as to how he "took care of it," Mr. Radavich said, "I killed the man." *Id.* at 8. Later in the conversation, Mr. Radavich told Mr. Watt he had used a sword and a knife. He said that afterward he disposed of his clothing and weapons. *Id.* at 15.

---

[2] A pseudonym.

When Mr. Watt told Mr. Radavich that he was not sure he believed him, Mr.

Radavich told Mr. Watt to look up "Bob Tester Spokane." *Id.* at 8. At no point in the

recorded conversation did Mr. Radavich tell Mr. Watt he acted in self-defense.

Detective Johnston relied on Mr. Watt's information to obtain a search warrant for

Mr. Radavich's cell phone. The cell phone information established that Mr. Radavich's

phone had been in the area of Mr. Tester's home at the time he was murdered. That and

further interviews led to Mr. Radavich's arrest. He was ultimately charged with

premeditated first degree murder with aggravating circumstances. During plea

negotiations, Mr. Radavich provided notice to the State that he would claim self-defense.

*Pretrial motions in limine and mistrial*

Approximately a week before trial, the court heard argument on the following

State motions in limine, among others:

- "To prohibit the defendant from presenting evidence that the victim, Robert Tester, was growing marijuana." Clerk's Papers (CP) at 36 (boldface omitted).

  The State informed the court that there was evidence that Mr. Tester cultivated marijuana, but it was irrelevant and if relevant, its limited probative value was outweighed by its prejudicial nature.

- To exclude evidence "regarding the age of [Erika Boyle] to include any reference to her being a minor, and the age difference between her and the victim, Robert Tester." CP at 46 (boldface omitted).

  Ms. Boyle was 16 years old at the time of Mr. Tester's murder. The State contended that evidence of the age difference between her and Mr. Tester should be excluded as unduly prejudicial under ER 403.

5

- To exclude evidence "regarding the alleged drug usage of the victim, Robert Tester." CP at 46 (boldface omitted).

- To conduct an evidentiary hearing to determine whether the defense would be permitted to offer evidence of Mr. Tester's character, reputation, and alleged prior bad acts.

  Mr. Radavich hoped to offer evidence of what he had heard about Mr. Tester's violent behavior, and the State sought a hearing outside the presence of the jury to determine whether Mr. Radavich could lay the necessary foundation.

During the hearing, the trial court invited defense counsel to identify the evidence he wished to offer on these subjects, and why. Defense counsel began with the fact that Mr. Tester was engaged in an illegal marijuana grow operation, and explained that it was a defense theory that because Mr. Radavich saw signs of the operation in the home (defense counsel mentioned "copious amounts of marijuana" and "scales"), he reasonably feared that Mr. Tester would "make absolute certainty that [Mr. Radavich] was not going to live to tell about what happened and what he saw." RP at 108. Defense counsel also argued that "a drug dealer's reputation in the community—is one of violence." RP at 111. He argued that knowing Mr. Tester dealt drugs illegally is "why my client went to him at the hour he did," and "why he went with the sword and the dagger and why he covered his face." *Id.*

Defense counsel suggested that the relevance of Ms. Boyle's age was that she originally met Mr. Tester when she was hired as a babysitter and it turned into a sexual relationship. He argued, "This is a . . . 30-something-year-old man who hired a babysitter

6

and became sexually involved with her and used her for his drug business and gave her a

concussion, among other things." RP at 113.

The trial court ruled that evidence of the age difference and the drug dealing

would be excluded, explaining, "I don't know how that could possibly fit into Mr.

Radavich's state of mind other than to paint the victim as a bad guy," and suggest that

"drug dealers always go around assaulting people and trying to kill them. And one

doesn't . . . support the other." *Id.* The State had argued that if ages were deemed

relevant, it could offer evidence that Mr. Radavich was in a dating relationship with Ms.

Boyle when he was 19 and she was 14. The trial court found none of it relevant and

ruled, "[A]t this point in time, I'm not going to admit . . . anything with regard to the age

difference." *Id.*

Turning to Mr. Tester's alleged propensity for violence, defense counsel argued

that Mr. Radavich knew from Ms. Boyle that Mr. Tester had caused her to have a

concussion, and that it was not the first time Mr. Tester had attacked and injured her. The

State's objection was that it was not yet clear what Ms. Boyle disclosed to Mr. Radavich,

so an offer of proof should be made prior to any ruling. The trial court agreed and

reserved ruling on that motion.

On the issue of Mr. Tester's drug use, the prosecutor spoke first, representing to

the court that there was evidence of drug use not only by Mr. Tester but by a number of

witnesses. This included a lot of marijuana use by Mr. Radavich, who lived in Idaho,

where it was illegal, and evidence of methamphetamine and marijuana use by Ms. Boyle. The prosecutor pointed out that the toxicology work done when Mr. Tester was autopsied found no drugs in his system.

Defense counsel argued that Mr. Radavich had heard from Ms. Boyle about the extent of her and Mr. Tester's methamphetamine use and it was relevant to why he went to Mr. Tester's home at the time he did, armed as he was. Questioned further about why Mr. Radavich's belief about Mr. Tester's drug use was relevant, defense counsel answered, "My client will testify that he knows what meth addicts are like." RP at 125. He argued that methamphetamine "was designed to keep our soldiers in World War II mean, fighting, and wide awake" and "creates unpredictable people." RP at 126. The State replied that the defense had no toxicology expert, and that it "will not be able to find [one] . . . that will do anything other than say that how somebody responds to a drug is dependent on the situation and the person and the dosage." RP at 127-28. The court ruled that its inclination was to exclude evidence of anyone's drug use.

Trial began on April 8, 2019. Following the selection of the jury, and outside its presence, Mr. Radavich called Ms. Boyle as a witness to make an offer of proof. Ms. Boyle testified to three acts of domestic violence toward her by Mr. Tester. She testified that she did not believe she told Mr. Radavich about them, but after the third incident, which took place the day before Mr. Tester was killed, she smoked marijuana with Mr. Radavich for about an hour, and she had facial injuries that would have been obvious.

She testified that the third occasion was the only time Mr. Radavich had seen her immediately after an assault, so he would not have seen any injury to her from the two prior incidents. In rebuttal questioning, defense counsel obtained Ms. Boyle's concession that while she could not remember telling Mr. Radavich about the assaults, she was consuming a lot of drugs and alcohol at the time. She testified, "I really can't remember everything that happened three years ago." RP at 259.

The trial court ruled that Mr. Radavich would be allowed to testify to his understanding that Mr. Tester had committed several acts of domestic violence against Ms. Boyle, explaining:

> I think it's relevant, as [defense counsel] indicates, to show Mr. Radavich's state of mind. It potentially could be relevant to his issue or his claim of—of self-defense. And it all really goes to show what—what Mr. Radavich knew at the time that he went over to Mr. Tester's home with regard to any violent propensities that Mr. Tester may have had.
>
> Now, I want to be clear that it's really not used as evidence of bad character. It's used to show Mr. Radavich's state of mind, because that's what I'm told the purpose of that information is.

RP at 295.

The State began presentation of its case after the court's ruling, but trial came to an abrupt halt the next morning, when the State informed the trial court of a significant discovery made the day before. As the prosecutor explained, after hearing Ms. Boyle's testimony, one of the detectives undertook a further review of records of Ms. Boyle's text messages. He came across a text exchange on the night of September 5, 2016, between

9

Ms. Boyle and Chris Santucci, a man she had been dating at the time. The prosecutor

described the text exchange that took place at 9:14 p.m.:

> The text reads, first from Mr. Santucci, "Where did you go?" Ms. [Boyle] responds, "Did you get it?" Mr. Santucci says, "No."
>
> The next thing that Ms. [Boyle] says is, "I'm talking to Radavich. The problem is solved." Santucci says, "What problem are we referring to?" Ms. [Boyle] responds, "Him."

RP at 450.

After discussing the ramifications, including Ms. Boyle's right under the Fifth

Amendment to the United States Constitution, defense counsel told the court that Mr.

Radavich had authorized him to request a mistrial. The State concurred, and a mistrial

was declared.

*Further pretrial and second trial*

In pretrial proceedings taking place before the second trial, Ms. Boyle appeared

with counsel and in response to brief questioning by the parties, invoked her Fifth

Amendment right to remain silent. The trial court declared her unavailable as a witness

and ruled that a transcript of her sworn offer of proof, which had been subjected to cross-

examination, could be used at trial by either party, subject to the court's in limine rulings.

Defense counsel also sought to revisit the court's in limine rulings. He argued that

evidence of a marijuana cultivation operation in the Tester home was relevant to the

conditions present when Mr. Radavich allegedly attempted to stop the altercation with

Mr. Tester and Mr. Tester continued to fight. The trial court was not persuaded to change

10

its ruling. Defense counsel also argued that Mr. Tester had used Ms. Boyle to sell marijuana to Mr. Radavich and others in Idaho, and one of his objectives in confronting Mr. Tester on September 6 was to make him stop using Ms. Boyle as a drug dealer. The court observed that this was the first time it had heard this piece of the defense theory. It again declined to change its rulings, but commented that if some unanticipated relevance developed during trial, the defense could raise it outside the presence of the jury.

The second trial began in August 2019. Among key evidence presented by the State was the testimony of Jessica Fitzgerald, who was acquainted with Mr. Radavich through work. Ms. Fitzgerald had been questioned by police after they obtained Mr. Radavich's cell phone records and saw that he had called her at 3:49 a.m. on September 6, 2016. Ms. Fitzgerald testified that around 3:00 a.m. that morning, Mr. Radavich came to her apartment looking "[s]tressed, just kind of pale, quieter than usual." RP at 1255. She testified, "he told me he'd just gone over to a guy's house and basically killed him." RP at 1256. He told Ms. Fitzgerald he used a sword and a knife, he knew the man was dead, and the man's daughter was present. She testified she did not observe any injuries to Mr. Radavich, and he never told her he killed the man in self-defense.

The State spent a significant amount of time questioning lead scene detective Stockman and Trevor Allen, a forensic scientist with the WSP crime scene response team, about their analysis of the crime scene.

11

Sergeant Stockman testified first, identifying dozens of photographs of the exterior

and interior of the home, the blood spatter, and Mr. Tester's body. Among them were

photographs of the exterior of the home, showing that the garage door was open. He

identified photographs of a door in the garage that led into the basement of the home as

well as photographs of the front door and front entryway into the home. Sergeant

Stockman testified that analysis of the blood evidence suggested that Mr. Tester first

began bleeding in his bedroom and that the path he followed before collapsing in the

living room was across the hallway to a bathroom, down the hallway, down a set of stairs

toward the basement but stopping at a bottom landing, and then returning upstairs to the

kitchen, dining area and living room. He testified that the absence of blood in the

basement suggested that Mr. Tester was never down there. Only a slight amount of Mr.

Tester's blood was found on the doorknob of the door that led from the basement to the

garage.

Mr. Allen testified that he, too concluded that the bloodletting started in the master

bedroom on the right-hand side of the bed and wall. He concluded that after leaving the

bedroom, the bleeding individual ended up in the hallway between the bedroom and the

hallway bathroom. After, the individual "basically went to the rest of the residence after

that in various locations," which Mr. Allen described. RP at 1186. He testified that

blood spatter in the living room suggested Mr. Tester was struck while he was within six

12

inches, or crawling, on the floor. Mr. Allen and his team also assessed the front entryway door and porch area but found nothing of evidentiary value there.

Dr. John Howard, a forensic pathologist and medical examiner, testified that the physical findings from Mr. Tester's autopsy indicated that many wounds, both blunt and sharp instrument injuries, caused his death. Mr. Tester had a total of 26 different sharp instrument injuries and more than 40 blunt impact injuries that were consistent with the use of a sword, knife, and splitting maul.

Dr. Howard testified that certain stab wounds to Mr. Tester's torso alone could have caused his death. In particular, Mr. Tester sustained wounds to his chest that punctured each of his lungs and his liver. He testified that injuries on Mr. Tester's hands were consistent with Mr. Tester being in a defensive position, shielding himself with his hands.

The State called Mr. Watt as a witness, and played a slightly redacted version of his recorded conversation with Mr. Radavich for the jury.

Mr. Radavich testified in his own defense. He testified that in the early morning hours of September 6, 2016, he approached Mr. Tester's home wearing work gloves and a bandana around his face, carrying a sword and dagger that he kept in his car for defense purposes. He testified, "At this point in time, I knew [Bob Tester] had at least three times assaulted a friend of mine," and it was because he did not want Mr. Tester to be able to

identify him and track him down later that he wore the bandana.  RP at 1395.  He testified

that he wore the gloves to hide a missing finger on his right hand.

He testified that lights were on in the Tester house when he arrived, and he

knocked at the front door.  He testified that Mr. Tester opened the door within a matter of

seconds and said, "Who the fuck are you?"  RP at 1398.  According to Mr. Radavich, he

responded, "It doesn't matter who I am.  You're never going to touch Iris again.  You're

going to stay away from her.  You're not going to call her or contact her.  And if you do,

I'm going to make sure the cops know everything that's been going on here."  RP at

1398.

Mr. Radavich testified that Mr. Tester stood to the side when answering the door,

his left arm and shoulder hidden, and he described what happened next:

> Q. . . . [A]fter you—you responded to Mr. Tester, then what happened?
>
> A. Ah, then finishing what he—he was saying and I was saying, he had taken a step to his right slightly (indicating) and swung a splitting maul up from the ground in his left hand towards me.  And then I had managed to be just enough out of the way that he wasn't able to hit me.  And then from there, I lunged forward to push him away from me to try to get away, and when he was falling backwards, grabbed my arm.  And I ended up tripping over the front steps of the doorway and got pulled into the house past him into the entryway here (indicating toward the easel).
>
> Q. And then what happened?
>
> A. From there, I moved a little further in just because my back was to him and I didn't trust what he might do with the splitting maul.  So I got a little further in and turned around.  And the door had been closed.  And he was coming at me with the splitting maul in his hands like this (indicating) ready to swing, and he just starts swinging at me.  And I'm—

14

I'm backing away.  I'm trying to stay away from him.  And he just keeps swinging and swinging and swinging at me.  We move a little ways further in, and I'm finally—I'm able to get the sword and the knife unsheathed out of my belt.  And I managed to fend him off by just kind of jabbing towards him.  He then keeps swinging, and then he decides I—or he drops the mallet, the splitting maul, and then just tries to start grappling with me, trying to take the sword and the knife from me.

At that point we're struggling here near the top of the stairs (indicating) and the baby gate that was laying on the floor.  At that point I was able to get the hand—my left hand free and fight back with the knife.  We ended up—he pushed me into the bathroom here in the hallway (indicating), and we were struggling, fighting in there.  And I was just—I was, out of a fight-or-flight, I was fighting.  I had no—he was pushing me and pulling me and just wouldn't let go.  And I just tried to get him off me (indicating), and he just wouldn't let go.  And I just kept fighting and fighting.

RP at 1399-1400.

Mr. Radavich testified that Mr. Tester then shoved him and went into the bedroom, where Mr. Radavich feared he might be retrieving a gun.  Mr. Radavich followed Mr. Tester into the bedroom, where he saw K.T.  Mr. Radavich claimed he lowered his hands and Mr. Tester ran past him, out of the room, at which point Mr. Radavich claimed he said to K.T. that she was fine, and "I'm not going to kill your dad. Just stay here."  RP at 1401.

Mr. Radavich testified that he went looking for Mr. Tester, who lunged at him from the bathroom and the two began fighting again.  While struggling at the top of the stairs to the basement, he said they both tripped and fell, with Mr. Tester falling as far as the bottom landing.  But the sword had also fallen down the stairs and Mr. Tester was

able to pick it up and run up toward him, swinging the sword. As they continued to fight, Mr. Radavich had the knife, but lost hold of that; Mr. Tester lost hold of the sword and grabbed the splitting maul; Mr. Radavich managed to wrest the splitting maul from Mr. Tester; and the fighting ended when Mr. Radavich swung the splitting maul and struck Mr. Tester in the head, at which point Mr. Tester fell to the ground. Mr. Radavich testified he then grabbed his sword and knife, decided to say something to the little girl—"I'd said, 'I'm sorry. Please forgive me. I'm sorry.'"—and then left through the basement door to the garage. RP at 1403. On arriving at his car, he stripped off his clothing and put it and his weapons on a beach towel that was in the back of his car. He testified, "I had been cleaning my car out previously at one point, so there was a trash bag in my car. And I had loaded up—just put all that in the trash bag and put on some extra clothes I just had in my car." RP at 1404.

Asked whether he called 911, he answered that he did not, explaining, "I had assumed that the little girl had called," and he was also concerned that if police responded, they might misunderstand the situation and shoot him. RP at 1404.

In closing argument, the prosecutor challenged the defense theory in multiple respects, including by arguing that Mr. Radavich's claim that he was pulled into the house after knocking on the front door was contrary to the evidence and implausible. She showed jurors several photographs of the front entryway, where multiple items, including a bag of dog food, stood undisturbed. She showed them a photograph of the front door,

16

reminding them it was a glass door, and argued it was unlikely Mr. Tester would have

opened the door in the middle of the night to a masked stranger. She argued that, instead,

Mr. Radavich had entered the home under the cover of darkness, using the element of

surprise to attack Mr. Tester in his bedroom. Mr. Radavich had admitted leaving the

home through the basement door into the garage, and the prosecutor argued,

> He entered where he exited, ladies and gentlemen. . . . The
> defendant left out of a basement door that's not at the bottom of the stairs
> but around the corner that had clothing and debris in front of it. He chose
> that door instead of the front door or the slider or any other exit even
> though he had to backtrack, because that's how he came in. He knew that
> he could go through the open garage again, jump over the fence, and escape
> to his car that he had parked down the road.

RP at 1479.

The jury found Mr. Radavich guilty of first degree murder and all the aggravating

circumstances on which it had been instructed. Mr. Radavich was sentenced to life in

prison without parole. He appeals.

## ANALYSIS

Mr. Radavich makes nine assignments of error, but we review them as presenting

three challenges: (1) the trial court's in limine rulings excluding evidence were erroneous

and violated Mr. Radavich's constitutional right to present a defense, (2) the evidence

was insufficient to prove that the murder was committed during the course of, or in

furtherance of, first degree burglary, and (3) Mr. Radavich's right to jury unanimity was

violated. We address the challenges in that order.

I.     MR. RADAVICH'S CHALLENGES TO ALLEGED IN LIMINE RULINGS ARE EITHER
       UNPRESERVED OR FAIL ON THE MERITS

The jury was properly instructed that it is a defense to a charge of murder that the

homicide was justifiable, meaning "1) the slayer reasonably believed that the person slain

intended to inflict death or great personal injury; 2) the slayer reasonably believed that

there was imminent danger of such harm being accomplished; and 3) the slayer employed

such force and means as a reasonably prudent person would use under the same or similar

conditions as they reasonably appeared to the slayer, taking into consideration all the

facts and circumstances as they appeared to him at the time of the incident."  CP at 125;

RCW 9A.16.050(1).

Relying on the importance of the "conditions as they reasonably appeared to the

slayer," Mr. Radavich contends the trial court abused its discretion by excluding evidence

of his knowledge that Mr. Tester had an illegal marijuana operation and used

methamphetamine.  He also contends the trial court abused its discretion by "limit[ing]

Mr. Radavich] to testifying only generically that he knew Mr. Tester had 'assaulted' Iris

three times and injured her" and by "redact[ing] the recording of John Radavich's call to

Ricky Watt" to exclude allegations that Mr. Tester had raped Iris and had sex with Iris in

front of his eight-year-old daughter.  Appellant's Am. Opening Br. at 5-6.

We first address the latter contentions, which mischaracterize the trial court's

rulings and are raised for the first time on appeal.  We then turn to Mr. Radavich's

18

preserved objections to the exclusion of his knowledge that Mr. Tester was a drug dealer

and methamphetamine user.

> A.    *Setting aside Mr. Radavich's desire to offer evidence of drug use, the trial court ruled that evidence of his knowledge of assaults on Ms. Boyle was admissible*

The State's pretrial motions in limine acknowledged that a victim's reputation for

using deadly weapons and for quarrelsome behavior is admissible to show whether the

defendant had a reasonable apprehension of danger.  Because Mr. Radavich had asserted

a claim of self-defense, the State conceded that evidence of Mr. Tester's character or

reputation would be admissible with the proper foundation.  It asked the trial court to

conduct an evidentiary hearing to determine whether Mr. Radavich could lay a

foundation for whatever character or reputation evidence he wished to offer.

Mr. Radavich responded with briefing that included an offer of proof.  On the

matter of Mr. Tester's violence toward Ms. Boyle, who was referred to as Skittles, the

offer of proof stated only the following:

> 3.    On or about September 7, 2016, the decedent inflicted great bodily harm upon Skittles.
>
> 4.    In the early evening, Skittles contacted John and they met.  During the meeting, she notified John about the great bodily harm, and he witnessed severe injuries to her face.
>
> . . . .
>
> 8.    John had seen what the decedent had done to Skittles.

CP at 68.

19

In the argument section of his brief, Mr. Radavich said the following about the

evidence of violence he wished to offer:

> [D]ecedent committed domestic battery on Skittles the day prior to John's
> attempt to tell decedent to stop beating her. . . . John was fully aware of the
> domestic violence perpetrated upon Skittles. As such, the jury must be
> made aware of the decedent's propensity for violence (character) because it
> was the very reason John was prepared to defend himself.

CP at 71.

The court heard pretrial matters on March 29, 2019, including this issue of

whether evidence of Mr. Tester's past violence could be offered at trial. Asked by the

trial court what "prior bad acts . . . your client is supposed to have known about with

regard to Ms. [Boyle]," defense counsel answered:

> As far as—as an offer of proof in that regard, my client knew full well from
> Ms. [Boyle] that it was the decedent—I—I want to make sure I've got
> the—the—it was the decedent who inflicted the bodily harm upon her, that
> being a concussion, and that it was my client's knowledge of that, just that
> fact, and that—that he had known that it was not the first time that the
> decedent had—had attacked and—and committed harm upon Ms. [Boyle].

RP at 114-15.

The trial court asked defense counsel, "[T]ell me more about what the testimony

will be. . . . How does he know what happened?" RP at 116. Defense counsel responded

that he anticipated Ms. Boyle would testify that she texted Mr. Radavich from the

Kootenai Medical Center on the evening before Mr. Tester was killed to let him know she

wanted to hang out, she and Mr. Radavich got together, and she told him why she had

been at the medical center. Defense counsel also said,

> [M]y client and Ms.—Ms. [Boyle] had been in communication over the—
> the previous several weeks. And—and Ms. [Boyle] was telling him about
> her relationship and the—the innate violence that had evolved in her
> relationship with the decedent.

RP at 117.

The State responded that it expected the testimony "to perhaps be a little bit

different," which is why it wanted to have an evidentiary hearing. RP at 118. The trial

court acknowledged it had agreed to conduct a hearing on the defense offer of proof, but

it shared its preliminary thoughts:

> [I]f—it's based upon what is Mr. Radavich's state of mind if—and if there
> have been—you know, what does he know at the time? And so if it is as
> described by [defense counsel] with regard to the fact that this is a violent
> individual and she got a concussion and it was—and it's fairly
> contemporaneous or not too remote, I would be inclined to allow that.

RP at 119. Since the prosecutor had not had an opportunity to interview Ms. Boyle, the

court commented, "All right, so that one is on hold, but that—that's kind of my thought

process on that." RP at 119-20.

As recounted above, Ms. Boyle was called to provide a sworn offer of proof on the

second day of the first trial. She testified to the three acts of domestic violence by Mr.

Tester, and that she did not recall telling Mr. Radavich about them. Nevertheless, after

considering the issue overnight, the trial court ruled that evidence of all three would be

admissible as "relevant,"

> as [defense counsel] indicates, to show Mr. Radavich's state of mind. It potentially could be relevant to his issue or his claim of—of self-defense. And it all really goes to show what—what Mr. Radavich knew at the time that he went over to Mr. Tester's home with regard to any violent propensities that Mr. Tester may have had.
>
> Now, I want to be clear that it's really not used as evidence of bad character. It's used to show Mr. Radavich's state of mind, because that's what I'm told the purpose of that information is.

RP at 295.

The trial court did not retreat from that ruling after Ms. Boyle became unavailable

as a witness. Mr. Radavich could have testified to what he knew about the three acts of

violence, although not that they were "methamphetamine-fueled." He chose to testify

only summarily about knowing of the three assaults. *See* RP at 1395. This might have

been because he was aware the State was ready to offer testimony of Ms. Boyle in

rebuttal that would not have been helpful to his defense.

The trial court never ruled that Mr. Radavich was precluded from testifying about

other acts of violence by Mr. Tester against Ms. Boyle. Mr. Radavich never informed the

trial court that *there were* other acts of violence against Ms. Boyle. The court had said

the defense could ask the court to revisit its rulings limiting Mr. Radavich's testimony

based on developments at trial, but needed to do it before he took the stand. *See* RP at

22

497. Its orders on in limine motions always contemplated requests for reconsideration, stating that they "shall be made . . . outside the presence of the jury." CP at 75, 77, 83.

"RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them." *State v. Guzman Nunez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). More specifically, ER 103(a)(2) provides that error may not be predicated on a ruling excluding evidence unless a substantial right of a party is affected and "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

An offer of proof serves three purposes when a trial judge is considering the exclusion of evidence:

> [I]t informs the court of the legal theory under which the offered evidence is admissible; it informs the judge of the specific nature of the offered evidence so that the court can assess its admissibility; and it creates a record adequate for review.

*Adcox v. Child.'s Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 26, 864 P.2d 921 (1993) (alteration in original) (quoting *State v. Ray*, 116 Wn.2d 531, 538, 806 P.2d 1220 (1991)). The offer must communicate to the trial court the substance of the evidence in question so as to make clear to the trial court what is being offered in proof, and why the offer should be admitted over the opponent's objections, so the court may make an informed ruling. *Ray*, 116 Wn.2d at 539.

Mr. Radavich is unable to point to an offer of proof made in the trial court that would make this assignment of error reviewable on appeal. His only relevant citation to the record is to the following representation made by defense counsel shortly after Ms. Boyle testified, and before the trial court ruled that evidence of the three acts of violence she described would be admitted:

> My client will—will make as an offer of proof and it's anticipated that he will testify at trial that in fact Ms. [Boyle] told him after *each incident* and—and texted him and informed him of the situation, including him seeing bruising and—and talking to her about how—how she got the bruises.

RP at 264 (emphasis added). Since defense counsel did not provide the "specific nature" of "each incident," the trial court would have reasonably understood "each incident" to mean the three incidents testified to by Ms. Boyle.

Mr. Radavich also cites to the trial court's comments before taking the issue under advisement that it was inclined to allow testimony about the last act of violence (when Mr. Radavich saw signs of injury) but had concerns about the two earlier incidents, since Ms. Boyle did not believe she told Mr. Radavich about them. Of course, the trial court changed its mind by the time it ruled the next morning. It ruled that evidence of all three incidents was admissible.

Other than the trial court's exclusion of evidence of drug use, Mr. Radavich fails to demonstrate any limitation on his ability to testify to his knowledge of domestic violence disclosed to the trial court. His failure to point to any limitation is fatal to his

24

argument of evidentiary error as well as his argument that he was deprived, in this respect, of his right to present a defense.

        B.      Mr. Radavich's complaint about redactions of the recorded conversation with Mr. Watt is also unpreserved error

There were many conversations during the trial about redactions of the recorded conversation with Mr. Watt that would be required to conform to the rulings excluding evidence. It is clear that at trial, Mr. Radavich did not raise the objections that he now raises on appeal.[3]

Before the first trial and Ms. Boyle's offer of proof, the State raised the need to redact the recorded conversation to comply with any in limine rulings. It noted at the pretrial conference on March 29 that whether to redact Mr. Radavich's recorded statement to Mr. Watt that Mr. Tester "was pretty much beating her, and raping her" would depend on the defense offer of proof. RP at 180.

At the first trial, following Ms. Boyle's offer of proof, the prosecutor asked the court to take 15 minutes to rule on redactions of the recorded conversation before the State called Mr. Watt as its first witness. Rulings on the redactions were made on the record, with Mr. Radavich and defense counsel present. Because there had been no offer of proof of any rape, the State requested and the trial court agreed that two of Mr.

---

[3] Defense counsel did object to a different set of redactions—to photographs and diagrams of the home from which the presence of bags of marijuana had been redacted—and he renewed that objection several times at trial.

Radavich's recorded statements about rape should be redacted. *See* RP at 271 (redacting "he was pretty much . . . raping her") and 272-73 ("this innocent person . . . being . . . raped on a regular basis"). The defense did not object. Defense counsel did ask the trial court to reconsider its redaction of Mr. Radavich's recorded statement, "And he was doing—he was doing this in front of his 8-year-old daughter," a statement that did not refer to any rape. RP at 277. The trial court agreed with the defense that the statement could stay in.

In the second trial, the prosecutor reported to the trial court that she had earlier been able to meet with defense counsel and agree to redactions to the recorded conversation. Defense counsel did not dispute that representation. Later on, when the parties suggested making a record that Mr. Radavich objected to the recorded conversation coming in at all, defense counsel stated, "I will stand by the objection that the entire thing should not come in." RP at 846. The following exchange then occurred:

> THE COURT: And the—and that's what your—my recollection of the objection was that none of the testimony should come in, and I—and I've got that. But I do not recall if you had specific objections to the redactions.
>
> [DEFENSE COUNSEL]: To—specifically to the redactions, your Honor, no, I do not—
>
> THE COURT: Okay—
>
> [DEFENSE COUNSEL]: —have objections to the redactions—
>
> THE COURT: —all right.
>
> [DEFENSE COUNSEL]: —themselves.

THE COURT: So you have—

[DEFENSE COUNSEL]: Given—given the Court's, all the Court's ruling.

THE COURT: So P-3 is the redacted version. You're not objecting to the method in which it was redacted, just the entire—the entire conversation?

[DEFENSE COUNSEL]: That is correct, your Honor.

THE COURT: Got it. Okay. All right.

RP at 847.

Here again, because no objection to redacting the references to rapes was raised in the trial court, any issue is waived. RAP 2.5(a). And since there is no offer of proof or anything else in the record to suggest that Mr. Radavich believed Ms. Boyle *was* raped by Mr. Tester, no deprivation of the constitutional right to present a defense is shown.[4]

C.      The trial court's exclusion of drug evidence was not an abuse of discretion nor did it deprive Mr. Radavich of his constitutional right to present a defense

We turn to the exclusion of evidence that Mr. Tester illegally dealt marijuana and used methamphetamine, which Mr. Radavich did object to below. Where, as here, a defendant challenges an evidentiary ruling as both an abuse of discretion and a deprivation of the constitutional right to present a defense, it generally makes sense to

---

[4] There are the two unsworn statements made by Mr. Radavich in the recorded conversation with Mr. Watt. Not only were they unsworn, but Mr. Radavich testified that he engaged in "bragging and bravado" during that conversation. RP at 1408. Since he never made an offer of proof that he believed Ms. Boyle had been raped and made no objection to the references to rape being redacted, we can only infer that those statements were part of the bragging and bravado.

27

decide first whether the evidentiary ruling was erroneous, and then, if it was not, or if the error was harmless, whether the exclusion of evidence violated the defendant's right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). We address Mr. Radavich's challenges to the exclusion of drug evidence in that order.

1.      Evidentiary ruling

We review a trial court's evidentiary rulings for abuse of discretion. *Id.* (citing *State v. Brockob*, 159 Wn.2d 311, 348, 150 P.3d 59 (2006)). A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. *Id.* at 60 (citing *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).

Here, the trial court was not persuaded that Mr. Radavich's proposed testimony about Mr. Tester's illegal marijuana operation and methamphetamine use was relevant. Relevant evidence is "evidence having any tendency to make the existence of any fact . . . more probable or less probable than it would be without the evidence." ER 401. Mr. Radavich argued that evidence he was aware of Mr. Tester's illegal marijuana operation and methamphetamine use explained his concern about Mr. Tester's propensity for violence, making it more probable that he armed himself for defensive, rather than offensive reasons, and that he reasonably believed in committing his fatal assault that Mr. Tester intended to inflict death or great personal injury to him. The trial court observed that Mr. Radavich's belief that marijuana dealing and methamphetamine use made Mr.

28

Tester dangerously violent was too speculative to be relevant. *See State v. Dixon*, 159

Wn.2d 65, 79, 147 P.3d 991 (2006) (evidence that is too speculative is not relevant).

The trial court also questioned whether, even if the evidence had some relevance,

that relevance was outweighed by undue prejudice and the risk of inviting speculation by

the jury. "Although relevant, evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury," among other reasons. ER 403.

In *State v. Lewis*, this court held that the trial court did not abuse its discretion in

excluding testimony from Dr. Roberto Ramos, a medical examiner, about the high level

of methamphetamine found in a murder victim's body. The court explained:

> Because of the wide range of effects of various quantities of
> methamphetamine on diverse individuals, and because Dr. Ramos had
> never observed [the victim] alive, with or without methamphetamine in his
> system, Dr. Ramos had no idea how the methamphetamine might have
> affected [him]. And, therefore, his testimony could not have helped the
> jury.
>
> Rather, as the trial court determined, this expert testimony would
> have been speculative and irrelevant to the issues the jury had to decide.

141 Wn. App. 367, 389, 166 P.3d 786 (2007).

In a recent decision, our Supreme Court found it reasonable for the trial court to

exclude a toxicology report that would have confirmed that the homicide victim in that

case had a high level of methamphetamine in his system at the time he was shot by the

defendant. The trial court had reasoned that "allowing the toxicology report would

essentially allow an unqualified expert, the defendant, to express an opinion about how methamphetamine affected the victim when even a qualified expert would not be able to do so." *Jennings*, 199 Wn.2d at 60. The Supreme Court observed that a reasonable judge could conclude that the toxicology report "was speculative and could confuse the jury." *Id.* at 63.

Here, there was neither a toxicology expert nor a positive toxicology report. There was only Mr. Radavich, who had never met Mr. Tester, and who the State argued could offer no rational basis for his generalizations about marijuana dealers and methamphetamine users. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." ER 602. And a lay witness's testimony in the form of an inference is limited to inferences that are, among other requirements, both "rationally based on the perception of the witness" and "not based on scientific, technical, or other specialized knowledge within the scope of rule 702." ER 701(a), (c).

The trial court ruled that Mr. Radavich could offer evidence of his knowledge of Mr. Tester's assaults of Ms. Boyle to explain his concern that Mr. Tester was violent. But a reasonable judge could conclude that the defense offered an insufficient foundation for Mr. Radavich's testimony that marijuana dealers and methamphetamine users are characteristically violent. A reasonable judge could also conclude that even if Mr. Radavich's knowledge of Mr. Tester's marijuana operation and methamphetamine use

30

was minimally relevant, its relevance was outweighed by the prospect of undue prejudice and confusion of the issues. No abuse of discretion is shown.

2. Constitutional right to present a defense

The latitude of states to make and apply rules excluding a criminal defendant's evidence "has limits. 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."'" *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984))). Article I, section 22 of the Washington Constitution guarantees criminal defendants a right to present testimony in their defense that is equivalent to the right guaranteed by the United States Constitution. *See State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983).

Evidence rules impermissibly abridge a criminal defendant's right to present a defense if they are "'arbitrary' or 'disproportionate' and 'infringe[ ] upon a weighty interest of the accused.'" *State v. Rafay*, 168 Wn. App. 734, 796, 285 P.3d 83 (2012) (alteration in original) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)). In the exceptional case where an evidence rule abridges

31

a defendant's right to present a defense, we must disregard the rule in order to protect the paramount constitutional right.

As recently observed by our Supreme Court in *Jennings*, however, the Constitution permits judges to exclude evidence that is repetitive, only marginally relevant, or that poses an undue risk of harassment, prejudice, or confusion of the issues. 199 Wn.2d at 63 (citing *Holmes*, 547 U.S. at 326-27 and *Crane*, 476 U.S. at 689-90). If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights. *Id.* (citing *Hudlow*, 99 Wn.2d at 16).

In this case, the drug evidence is of questionable relevance for two reasons. One, already addressed, is its speculative nature given Mr. Radavich's lack of personal knowledge and the dubious basis for his inferences.

The other is that what a slayer knows about the character of the person slain is ordinarily material only when the slayer is presented with what is arguably not an imminent danger of death or great personal injury. In such a case, it can be the slayer's knowledge of the dangerous character of the person slain that explains why the slayer responded with deadly force. For instance, in *State v. Duarte Vela*, 200 Wn. App. 306, 402 P.3d 281 (2017)—a case on which Mr. Radavich relies—it was not apparent that

Jesus Duarte Vela faced a dangerous situation on the day he shot his former brother-in-

law. As described by the dissent in that case, Duarte Vela shot the man

> without warning after tracking him down for the third time that day and
> forcing the car he was in to stop. There was no reason to believe the victim
> was armed, so Mr. Duarte Vela's fear that his victim was reaching for a
> nonexistent weapon understandably was rejected by the jury. . . . No
> evidence was offered that Mr. Duarte Vela had reason to believe the victim
> was reaching for a gun at the time of the shooting. If the defense had
> evidence that the victim typically was armed or had threatened to use a
> firearm in the past, they did not offer it. That corroboration was lacking.

*Id.* at 329 (Korsmo, J., dissenting). The majority of the panel held that it was error for the

trial court to exclude evidence that the slain brother-in-law had abducted one of Duarte

Vela's sisters when she was 15 years old; that the brother-in-law had repeatedly battered

the sister whom he had married; that two years earlier, the brother-in-law had threatened

from prison to kill Duarte Vela's entire family; and that the brother-in-law had reentered

the United States and traveled to Washington State the day before he was killed. The

majority deemed this information highly relevant as the jury weighed the reasonableness

of Duarte Vela's fear.

In this case, by contrast, Mr. Radavich testified to events that—if believed by the

jury—were a "fight to the death" from the outset, with Mr. Tester the aggressor. RP at

1488. According to Mr. Radavich, Mr. Tester swung a splitting maul at him immediately

after he said his piece. Mr. Radavich described Mr. Tester as "swinging and swinging

and swinging at me" and "grappling with me, trying to take the sword and knife," and

33

"pushing me and pulling me and just wouldn't let go" until Mr. Radavich managed to fell

Mr. Tester with a blow to the head. RP at 1399-1400. If true, the scenario presented no

reason (let alone opportunity) for Mr. Radavich to reflect on whether Mr. Tester's drug

dealing and use made him dangerous.

For that reason, and because Mr. Radavich was able to testify to the acts of

violence against Ms. Boyle to explain why he went to the Tester home armed as he did,

the State's compelling interest in limiting prejudice and confusion outweighed any slight

relevance of the drug evidence. No constitutional deprivation is shown.

II.     EVIDENCE THAT THE MURDER WAS COMMITTED IN THE COURSE OF A BURGLARY
        WAS SUFFICIENT

Mr. Radavich next presents an evidence sufficiency challenge, contending that the

State failed to prove that the murder was committed in the course of, or in furtherance of,

burglary in the first degree. It was the jury's finding of this aggravating circumstance

under RCW 10.95.020(11)(c) that elevated the seriousness level of Mr. Radavich's first

degree murder conviction to XVI, and to a mandatory life without parole sentence.

RCW 9.94A.510, .515.

"Under both the federal and state constitutions, due process requires that the

State prove every element of a crime beyond a reasonable doubt." *State v. Johnson*,

188 Wn.2d 742, 750, 399 P.3d 507 (2017). An RCW 10.95.020 aggravating factor is an

element for jury trial purposes. *State v. Allen*, 192 Wn.2d 526, 544, 431 P.3d 117 (2018).

A challenge to the sufficiency of the evidence admits the truth of the State's evidence, and all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). Evidence is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Circumstantial evidence and direct evidence are equally reliable. *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). We defer to the trier of fact on "issues of witness credibility," as well as its resolution of conflicting testimony. *Witherspoon*, 180 Wn.2d at 883.

The jury was correctly instructed that a person commits first degree burglary when, among other elements, the person "enters or remains unlawfully in a building." CP at 111. It was instructed that a person enters or remains unlawfully "when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." CP at 112. Mr. Radavich argues that since he was pulled into the home by Mr. Tester, he did not enter unlawfully. He relies on Washington case law holding that the mere commission of a crime in a location where a person was licensed, invited or privileged to be does not negate his license, invitation or privilege so as to establish a burglary. Appellant's Am. Opening Br. at 42 (citing cases). He appears to contend that because the State only briefly cross-examined him about his claim to have been pulled into the home, it is his testimony alone that we should review for sufficient evidence of an unlawful entry.

35

Viewing the evidence in the light most favorable to the State, however, it presented evidence that the garage door was open at the time of law enforcement's arrival, there was a door in the garage through which Mr. Radavich could have entered the home's basement, the blood evidence suggested that the attack began in Mr. Tester's bedroom, and Mr. Radavich left through the basement door and out the garage. The State presented evidence that there were no signs of any disturbance in the small front entryway where—according to Mr. Radavich—he pushed Mr. Tester who fell backward, pulling Mr. Radavich over him and inside, and the men began their violent struggle. The State presented the recorded conversation with Mr. Watt in which Mr. Radavich made statements that when "the police wouldn't do jack shit" about what was happening to Ms. Boyle, "I took care of it," and "removed him from the equation." Ex. P-3, at 7. The State was able to argue that this circumstantial evidence was consistent with a furtive entry by Mr. Radavich and a surprise attack in the bedroom. It was able to argue that this was more plausible than that Mr. Tester opened his door in the middle of the night to a masked stranger.

The evidence was sufficient.

Mr. Radavich nonetheless argues that the trial court's ruling that he was entitled to a "no duty to retreat" instruction means the court was persuaded he was in a place where he had a right to be. Appellant's Am. Opening Br. at 45-46. But each party is entitled to

36

have the jury instructed on its theory of the case when there is sufficient evidence to support it. *State v. Knapp*, 11 Wn. App. 2d 375, 380, 453 P.3d 1006 (2019). Mr. Radavich's testimony, if believed by the jury, would support his contention that having been pulled into the house by Mr. Tester, he was in a place where he had a right to be. That he had some evidence to support his theory says nothing about the sufficiency of the State's evidence to support *its* theory—and it is the State's theory that proved persuasive to the jury.

III.     NO VIOLATION OF THE REQUIREMENT FOR JURY UNANIMITY IS SHOWN

Mr. Radavich's final assignment of error contends he was denied his constitutional right to a unanimous finding of guilt in one of two ways.

His primary argument is that first degree burglary is a crime that can be committed by alternative means: either by "'unlawfully entering'" premises, or by "'unlawfully remaining'" in premises. Appellant's Am. Opening Br. at 47. He contends that sufficient evidence does not support both alternative means.

An alternative means offense is one where the statute defining the offense provides that the proscribed criminal conduct can be proved in multiple ways. *State v. Barboza-Cortes*, 194 Wn.2d 639, 643, 451 P.3d 707 (2019). If a crime *is* an alternative means crime, then either an expression of jury unanimity on the means is required or the

State must present sufficient evidence to support each means. *Id.* The jury was not instructed that it must be unanimous as to the means of committing first degree burglary in this case, and Mr. Radavich argues that insufficient evidence supports the "unlawfully entering" means.

Deciding whether a statute creates an alternative means crime or is a "single means" crime, describing an offense in terms of closely related acts that are aspects of one type of conduct, is left to the courts. *Id.* In *State v. Smith*, 17 Wn. App. 2d 146, 150, 157, 484 P.3d 550, *review denied*, 198 Wn.2d 1005, 493 P.3d 747 (2021), Division Two of this court held that the phrase "enters or remains unlawfully" in RCW 9A.52.025(1), which defines residential burglary, "identifies a single means of committing residential burglary: entering or remaining unlawfully in a dwelling." Its opinion observes that Division One construed the phrase in a second degree burglary case as describing alternative means in *State v. Klimes*, 117 Wn. App. 758, 764, 73 P.3d 416 (2003). (The phrase "enters or remains unlawfully" is common to statutes defining first degree, second degree, and residential burglary, *see* RCW 9A.52.020(1), .025(1), and .030(1)). The opinion in *Smith* observes that following *Klimes*, published decisions from all three divisions had treated burglary as an alternative means crime without analysis. *Smith*, 17 Wn. App. 2d at 152 (citing cases).

*Smith* arrived at a different conclusion, applying a refined analytical framework applied by our Supreme Court in its most recent, controlling cases. 17 Wn. App. 2d at

38

152-53. Reviewing the Supreme Court's cases, the court in *Smith* concluded they "do not

agree with the apparent basis for the holding in *Klimes*—that a description in the statute

of separate acts necessarily establishes an alternative means offense." *Id.* at 153. The

court in *Smith* reasoned that while entering and remaining in a dwelling are separate acts,

> the focus of the [residential burglary] statute is the unlawfulness of the
> defendant's conduct. The actual conduct the statute prohibits is being
> present in a dwelling unlawfully. Entering and remaining are merely
> "'nuances inhering in the same [prohibited] act'" and "'facets of the same
> criminal conduct.'" *Barboza-Cortes*, 194 Wn.2d at 646, (quoting [*State v.*]
> *Sandholm*, 184 Wn.2d [726,] 734, [364 P.3d 87 2015]).

*Id.* at 156 (emphasis omitted) (second alteration in original). It also observed that

RCW 9A.52.010(2) does not contain separate definitions for "enters unlawfully" and

"remains unlawfully," but includes the two acts under a definition of a single term:

"enters or remains unlawfully." *Id.* at 156.

Smith is persuasive. We choose to follow it, which is fatal to Mr. Radavich's

argument that he was deprived of jury unanimity on the criminal means.

Mr. Radavich's alternative unanimity challenge is that his right to jury unanimity

was violated under *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), *abrogated on*

*other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988). *Petrich*

addresses the requirement for unanimity "[w]hen the evidence indicates that several

distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct." *Id.* at 572. In a "multiple act" case, the State must either elect the act on which it will rely for the conviction, or the court must instruct the jury that all 12 must agree that the same underlying criminal act has been proved beyond a reasonable doubt. *Id.* at 569; *Kitchen*, 110 Wn.2d at 411.

Mr. Radavich identifies no multiple criminal acts supported by the evidence in his case, only conflicting evidence about how he entered the premises. The *Petrich* rule only applies "where several acts are alleged, *any one of which could constitute the crime charged.*" *State v. Crane*, 116 Wn.2d 315, 325, 804 P.2d 10 (1991) (emphasis added), *abrogated on other grounds by In re Pers. Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002). To determine whether *Petrich* is applicable, the court must ask the following three questions: (1) what must be proved under the applicable statute, as set forth in the to-convict jury instruction, (2) what does the evidence disclose, and (3) does the evidence disclose more than one violation of the statute? *State v. Hanson*, 59 Wn. App. 651, 656-57 & n.5, 800 P.2d 1124 (1990). The third inquiry "requires a comparison of what the statute requires with what the evidence proves. If the evidence proves only one violation, then no *Petrich* instruction is required, for a general verdict will necessarily reflect unanimous agreement that the one violation occurred." *Id.* at 657.

The evidence offered in this case proved only one murder, in furtherance of one burglary. No violation of Mr. Radavich's right to a unanimous jury verdict is shown.

No. 37135-2-III
*State v. Radavich*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.